IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| James Edward Ellerbe, ) | |
| ) | Civil Action No. 6:04-22944-HFF-WMC |
| Plaintiff, ) | |
| ) | |
| vs. ) | **REPORT OF MAGISTRATE JUDGE** |
| ) | |
| United States of America, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. In his complaint, the plaintiff, a federal prisoner who is proceeding *pro se*, initiated this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§1346(b) and 2671-2680, alleging that medical staff at the Federal Correctional Institution in Allenwood, Pennsylvania ("FCI Allenwood), and the Federal Correctional Institution in Edgefield, South Carolina ("FCI Edgefield") were negligent in timely diagnosing and treating his left inguinal hernia.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(e), D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

The defendant filed its motion for summary judgment on June 3, 2005. By order of the court filed June 7, 2005, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary dismissal procedure and the possible consequences if he failed to adequately respond to the motion. The plaintiff filed a response on August 8, 2005.

**FACTS PRESENTED**

The plaintiff is currently incarcerated at FCI Edgefield. He is serving a 264-month term for conspiracy to possess with intent to distribute and distribution of cocaine base, and aiding and abetting, in violation of 21 U.S.C. §§841(a)(1) and 846, and 18 U.S.C. §2. This sentence was imposed in the United States District Court for the Eastern District of North Carolina. The plaintiff is a former deputy sheriff and investigator and was so employed during his actions as part of this criminal conspiracy and at the time of his arrest. His anticipated release date is June 25, 2016, via good conduct release.

The plaintiff filed an administrative claim with the Bureau of Prisons regarding his allegations of negligence, which was denied on May 13, 2004. Prior to the instant lawsuit, the plaintiff filed a complaint in Pennsylvania on February 4, 2003 claiming, as here, that the United States provided him with inadequate or negligent treatment for his hernia (def. m.s.j., ex. F). That allegation was dismissed for the plaintiff's failure to comply with the administrative requirements of the FTCA (def. m.s.j., ex. G). After exhausting his administrative remedies under the FTCA, plaintiff is realleging here those same allegations dismissed in the prior complaint.

The plaintiff arrived at FCI Allenwood on December 6, 2000, with a history of hypertension, hyperlipidemia, peptic ulcer disease, coronary artery disease, angioplasty and cardiac catheterization (def. m.s.j., ex. A, plaintiff's medical records, designated "MR" throughout, pp. 1, 62-65). He was seen in Health Services at FCI Allenwood on several occasions for complaints of chronic abdominal pain, angina, and dyspnea following his arrival (MR, generally pp. 64-103). He was placed in the Chronic Care Clinic to be seen at least once every three months (MR, p. 64). He was provided with proper dosages of the medications he arrived with and new prescriptions were written to provide him with additional medication (MR, pp. 63-64). He was advised to pick up these medications at the pharmacy; however, he did not do so (MR, p. 64). Instead, he reported to the medical unit on

6:04-cv-22944-HFF     Date Filed 11/08/05    Entry Number 57     Page 3 of 13

December 13, 2000, indicating he needed medications and "did not know" they were waiting for him in the pharmacy (MR, p. 64).

Although the plaintiff was seen at the FCI Allenwood medical unit on numerous occasions, the first time he complained of "groin pain" was November 6, 2002 (MR, pp. 64-96). On that day, the plaintiff was seen by Certified Physician Assistant ("PA-C") Robert Manenkoff (MR, p. 96; def. m.s.j., exhibit B, Robert Manenkoff decl. ¶¶ 4-12). The plaintiff presented with complaints of pain in his left groin (MR, p. 96; Manenkoff decl. ¶4). He was examined and diagnosed as having a left inguinal hernia (MR, p. 96; Manenkoff decl. ¶¶ 4-5).

A hernia is a protrusion of organ or tissue through a weakened area of muscle or tissue (Manenkoff decl. ¶ 4; def. m.s.j., ex. C, Dr. R.J. Stallings aff. ¶ 6; def. m.s.j., ex. D, Dr. Rex Blocker decl. ¶ 14). The term "hernia" generally refers to abdominal hernias, where an organ or fatty tissue pushes the inner lining of the abdominal wall through a weak area in the abdominal muscles, causing a protrusion of the abdominal wall (Stallings aff. ¶ 6). An "inguinal hernia" is the most common type of hernia, and occurs when the intestine drops down into the internal ring, which is a naturally weakened area in the abdominal muscles caused by the dropping of the testes in men (Stallings aff. ¶8). Inguinal hernias can extend down into the scrotum. *Id.*

Hernias are classified as "reducible" or "non-reducible" (Stallings aff. ¶¶ 6-7). A reducible hernia is one where the tissue or fat can be pushed back into the abdominal cavity (Stallings aff. ¶ 7). A non-reducible hernia is one where the bulge of tissue or fat cannot be pushed back in through the abdominal wall. Hernias can be permanently corrected only through surgery; however, surgery is not the only treatment option (Stallings aff. ¶ 9). Surgery is not mandatory for reducible hernias and many patients live for years with such conditions without having them surgically corrected. This is not the case with non-reducible hernias. A non-reducible hernia can become strangulated or incarcerated, which can lead to various medical complications (Stallings aff. ¶ 7). The term "incarceration," when used to

3

describe a hernia, means that the protrusion has gotten stuck through the hole in the muscles and cannot be released and returned through the abdomen (Manenkoff decl. ¶ 9; Blocker decl. ¶ 14). A "strangulated hernia" is one where the blood flow to the affected tissue has been cut off (Manenkoff decl. ¶ 10).

The standard treatment for a reducible hernia is to reduce the bulge (Manenkoff decl. ¶ 5; Stallings aff. ¶¶ 7, 9; Blocker decl. ¶ 14). This is done by having the patient lie down and pushing firmly on the protrusion (Manekoff decl. ¶ 5; Blocker decl. ¶14). At times a hernia may reduce without any external pressure (Blocker decl. ¶14).

On November 6, 2002, PA-C Manenkoff diagnosed the plaintiff with a small inguinal hernia that was easily reduced (MR, p. 96; Manenkoff decl. ¶¶ 4-5). PA-C Manenkoff explained and demonstrated the proper way to reduce the hernia (MR, p. 96; Manenkoff decl. ¶ 5). The hernia reduced easily (MR, p. 96; Manenkoff decl. ¶ 6). PA-C Manenkoff explained to the plaintiff that surgery to correct a reducible hernia is considered elective and advised the plaintiff that he was not a good candidate for surgery at that time, given his other medical conditions, including cardiac problems and uncontrolled angina (Manenkoff decl. ¶ 7). PA-C Manenkoff explained to the plaintiff that a hernia can become strangulated or incarcerated, described the symptoms of each condition, and advised him to return to the clinic immediately if any of those symptoms became apparent (MR p. 96; Manenkoff decl. ¶¶ 8,11). PA-C Manenkoff advised the plaintiff that strangulation or incarceration of the hernia could necessitate surgical correction of the hernia (MR p. 96; Manenkoff decl. ¶11). The plaintiff was prescribed Tylenol 500 to ease any pain he might experience with the hernia (MR p. 96; Manenkoff decl. ¶ 12).

On November 25, 2002, the plaintiff reported to Health Services complaining that he was "unable to push [the hernia] back in" (MR, pp. 96-97). He also complained of chest pains and advised medical staff he had self-dosed with nitroglycerin four times that day (MR pp. 96-97). An EKG was done, and his rhythm appeared normal. The hernia was easily

4

reduced by the Physician's Assistant. The records reflect that plaintiff did not appear to be in any distress and he was advised to report to Health Services the following day at lunchtime for a blood pressure check. He did not appear to have his blood pressure checked (MR, p.97).

On December 13, 2002, the plaintiff was seen in Health Services for a routine chronic care evaluation. The plaintiff complained that he had occasional hernia pain on his left side, but there were no significant findings related to the hernia at that time (MR, pp. 98-99).

On December 16, 2002, the plaintiff reported to Health Services complaining that his hernia was hurting and his stomach burning. He also requested examination of a "mass" on his left side. Examination revealed a left inguinal hernia that was protruding but it was reduced while he was lying down. The Physician Assistant was unable to detect any mass. The plaintiff was educated about caring for his hernia and referred to the Chief Medical Officer for follow-up (MR, p. 100).

On December 18, 2002, the plaintiff was seen by the Clinical Director. A small left inguinal hernia was present and reducible, as was a small mass in the left abdomen. A CT scan of his pelvis and abdomen was ordered to further evaluate his complaints and a referral to a surgeon was initiated (MR, p. 101).

The plaintiff left FCI Allenwood on February 3, 2003, en route to FCI Edgefield (def. m.s.j., ex. E, SENTRY History of Admissions and Releases for the plaintiff). He was briefly held at the United States Penitentiary, Lewisburg, Pennsylvania, and at the United States Penitentiary, Atlanta, Georgia, prior to arriving at FCI Edgefield on March 13, 2003 (def. m.s.j., ex. E). The plaintiff did not complain about his hernia again until after he arrived at FCI Edgefield (MR, pp. 103-07).

The plaintiff arrived at FCI Edgefield on March 13, 2003 (MR, pp. 108-09; Blocker decl. ¶ 4 ). His initial transfer summary did not indicate a history of inguinal hernia

(MR, pp. 1, 106-07; Blocker decl. ¶ 4). The plaintiff filled out a medical history form at that time, indicating in one place that he had a hernia and in another place that he did not have a hernia (MR, pp. 503-04). He was given seven days of medication and assigned to the Chronic Care Clinic to be followed for his various medical concerns (MR, pp. 108-09; Blocker decl. ¶ 5). The plaintiff was seen at sick call several times by medical staff over the next three months, but never complained about a hernia (MR, pp. 110-19; Blocker decl. ¶¶ 7-10). He was also referred to and seen by the consultant cardiologist during this time (MR, pp. 117, 242; Blocker decl. ¶¶ 8-9).

On May 22, 2003, the plaintiff reported to sick call complaining of a lump in his right breast that had been present for approximately five days. A small mass was noted upon examination. An x-ray was ordered and taken, and he was referred to Dr. Rex Blocker, Staff Physician at FCI Edgefield, for follow-up that same day (MR, pp. 118-19). Dr. Blocker determined an outside evaluation of the mass was necessary and the paperwork was done to facilitate consultation with the surgeon (MR, pp. 119, 243; Blocker decl. ¶10).

In the afternoon of May 26, 2003, the plaintiff reported to medical staff with a complaint of pain and bulging in his lower abdomen (MR, pp. 120-21; Blocker decl. ¶11). This was the first time he complained about hernia pain to FCI Edgefield medical staff (MR, pp. 108-120; Blocker decl. ¶ 11). He stated that his "hernia is stuck, it won't go back." The medical staff on duty were unable to reduce the hernia and were concerned that it could be strangulated (MR, pp. 120-21; Blocker decl. ¶11). After consultation with Dr. Blocker via telephone, the plaintiff was taken to the Aiken Regional Medical Center emergency room for evaluation and treatment (MR, pp. 121; Blocker decl. ¶ 11). The staff at the Aiken Regional Medical Center did not see any sign of a hernia or strangulation/incarceration of a hernia (MR, pp. 427). The plaintiff was returned to FCI Edgefield that evening (MR, pp. 122). Dr. Blocker reviewed the notes from the FCI Edgefield medical staff the following day, and the notes from the Aiken Regional Medical Center when they were sent to FCI Edgefield (Blocker

6

decl. ¶¶ 12-13).  The plaintiff did not report any problems with his hernia for several weeks following this (MR, pp. 122-28; Blocker decl. ¶ 15).

On June 16, 2003, plaintiff was seen by Dr. Roosevelt J. Stallings, the consultant general surgeon, for his complaints about the mass in his right breast (MR, pp. 123, 243; Stallings aff. ¶¶ 11; Blocker decl. ¶17).  During the physical examination, Dr. Stallings noted that the plaintiff had a mass in the right breast and a left inguinal hernia (MR, p. 243; Stallings aff. ¶11; Blocker decl. ¶17).  Dr. Stallings noted that the hernia was reducible (MR, p. 243; Stallings aff. ¶11; Blocker decl. ¶17).  Dr. Stallings recommended a mammogram and ultrasound of the right breast and planned to reevaluate the plaintiff in a month (MR, p. 243; Stallings aff. ¶11; Blocker decl. ¶17).  Dr. Stallings made no recommendations concerning the hernia at that time (MR, p. 243; Stallings aff. ¶11; Blocker decl. ¶17).

The plaintiff was seen several times over the next 10 days for complaints of chest pain, but the hernia was never apparent, nor did the plaintiff complain to medical staff about it (MR, pp. 123-27; Blocker decl. ¶18).  At approximately 7:10 p.m. on June 27, 2003, the plaintiff complained to FCI Edgefield medical staff that he could not reduce his hernia (MR, pp. 128-29; Blocker decl. ¶19).  No hernia was found upon physical examination, although there was mild tenderness in the groin area (MR, p. 128; Blocker decl. ¶17).

Although he was seen in the medical unit several times in the interim, the plaintiff next complained of hernia problems during the evening of July 21, 2003 (MR, pp. 129-34).  There was no sign of acute distress or strangulation, although a tender mass was noted.  The patient was referred to Dr. Stallings, the general surgeon, for further evaluation of the hernia (MR, pp.134-5, 245; Blocker decl. ¶21).  He was seen the following morning by another mid-level practitioner as a followup to his hernia complaints (MR, pp. 136-37; Blocker decl. ¶ 22).  The hernia was noted to be reducible, and there was indication that a consultation with Dr. Stallings had already been ordered (MR, pp. 136-37; Blocker decl. ¶22).

On July 28, 2003, plaintiff received a mammogram at a local hospital for his right breast lump (MR, pp. 139; Blocker decl. ¶23). On August 13, 2003, plaintiff was seen in the Chronic Care Clinic with complaints about polyps and concerns raised from a prior colonoscopy (MR, pp. 140-41; Blocker decl. ¶24). A gastroenterology consult was requested (MR, pp. 140-41; Blocker decl. ¶ 24).

On August 18, 2003, plaintiff was seen by Dr. Stallings concerning his hernia. Dr. Stallings noted that the hernia was still reducible but recommended surgical correction of the problem "ASAP" (MR, p. 245; Stallings aff. ¶12; Blocker decl.¶25). Dr. Stallings explained the surgery and its attendant risks, and obtained the plaintiff's consent to proceed (MR, pp. 245, 531; Stallings aff. ¶12).

There are three classes of surgical needs: emergent, necessary and elective (Stallings aff. ¶13). Emergent conditions require immediate intervention, while necessary surgery should be done, but does not have to be done immediately. Dr. Stallings believed this hernia surgery to be necessary, but not emergent, so he noted that the surgery should be scheduled "ASAP." The first time that surgery was recommended to repair the left inguinal hernia was on August 18, 2003 (MR, pp. 141, 243, 245; Stallings aff. ¶¶ 12-16; Blocker decl. ¶¶ 25-26). FCI Edgefield medical staff took steps to schedule the surgery as soon as possible, noting the recommendation from Dr. Stallings in the record and preparing the appropriate consultation forms (MR, pp. 141, 247; Blocker decl. ¶¶ 26-27). Surgery for inmates at FCI Edgefield is scheduled through Medical Development International ("MDI"), a contractor who, among other things, schedules doctors, facilities and other necessary staff for outside medical procedures (Stallings aff. ¶17; Blocker decl. ¶27). MDI initially scheduled the surgery for October 29, 2003; however that date was changed twice, with the surgery being performed on November 5, 2003 (MR, pp. 247, 256-57; Stallings aff. ¶17).

Between August 18 and October 1, 2003, the plaintiff was seen for a variety of medical concerns, including a gastroenterology consultation, with no complaints regarding the hernia (MR, pp. 141-146; Blocker decl. ¶ 28).

On October 2, 2003, the plaintiff appeared at sick call complaining that he was unable to reduce his hernia (MR, pp. 146-47; Blocker decl. ¶ 29). Staff were able to reduce the hernia, and advised him not to lift any weight and to return to the clinic the following day (MR, pp. 146-47; Blocker decl. ¶ 29). He did not return to the clinic until October 7, 2003 (MR, pp.147-48; Blocker decl. ¶ 29).

On October 7, 2003, the plaintiff was seen by Dr. Blocker in the Chronic Care Clinic for complaints of recurring chest pain. Dr. Blocker noted that the plaintiff was scheduled for various upcoming procedures, including surgery to correct his hernia. The plaintiff was advised of the possible complications of the upcoming surgery. He did not indicate problems with the hernia at this time, although he was provided a hernia belt to use should the need arise (MR, pp.148-49; Blocker decl. ¶ 30).

A colonoscopy was performed on October 23, 2003 (MR, pp. 250-54; Blocker decl. ¶ 31). On November 3, 2003, Dr. Blocker contacted Dr. Stallings to discuss the possible implications of plaintiff's complaints of chest pain with respect to the scheduled hernia surgery. They decided that the risks were increased and that cardiac screening should be done prior to the surgery as a precaution (MR, pp. 151; Stallings aff. ¶18; Blocker decl. ¶ 32).

On November 5, 2003, the plaintiff was transported to Edgefield County Hospital for the surgery (MR, pp. 152, 256-57; Stallings aff. ¶19). He was evaluated for possible cardiac concerns and, finding none, he was taken to the surgical procedure room (MR, pp. 256-57; Stallings aff. ¶ 19). Dr. Stallings conducted surgical repair of the left inguinal hernia (MR, pp. 256-57; Stallings aff. ¶¶ 21-23). During the surgery, Dr. Stallings noted there was a large amount of scar tissue around the spermatic cord, which was removed via electrocautery (MR, pp. 256-57; Stallings aff. ¶ 21). The hernia sac was located,

separated from the spermatic cord and inverted (MR, pp. 256-57). Dr. Stallings found a large lipoma of the spermatic cord, which was separated from the cord, tied off and removed (MR, pp. 256-57; Stallings aff. ¶ 21). The hernia was corrected with an extra large Perfix plug (MR, pp. 256-57; Stallings aff. ¶ 22). The plaintiff was returned to FCI Edgefield that same day (Blocker decl. ¶ 33). Following the surgery, the plaintiff was seen by Dr. Stallings again on December 8, 2003, and January 29, 2003, to follow up. The plaintiff complained of decreased sperm production. No tests of sperm production have been conducted, and the plaintiff has not made any such request (Blocker decl. ¶¶ 34-36).

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

### **ANALYSIS**

The plaintiff alleges that the medical staffs at FCI Allenwood and FCI Edgefield were negligent in diagnosing and treating his left inguinal hernia. Federal prisoners may bring suit under the FTCA if they suffer injuries as a result of the negligence of government employees. 28 U.S.C. §1346(b)(1); *United States v. Muniz*, 374 U.S. 150, 153 (1963). Under the FTCA, the court must determine whether the United States is subject to tort liability by applying the substantive law of the state where the act or omission occurred. 28 U.S.C. §1346(b)(1).

In this case, the plaintiff alleges that the negligent actions occurred in both Pennsylvania (FCI Allenwood) and South Carolina (FCI Edgefield). In both states, a plaintiff alleging a medical malpractice claim must be able to show (1) a duty of care owed by the physician to the plaintiff; (2) a breach of that duty; and (3) damage proximately resulting from the breach. *Bloom v. Ravoira*, 529 S.E.2d 710, 712 (S.C. 2000); *Mitzelfelt v. Karmin*, 584 A.2d 888, 891 (Pa. 1990). Furthermore, in both Pennsylvania and South Carolina, a plaintiff must produce expert testimony in support of his claim. *Martasin v. Hilton Head Health System, L.P.,* 613 S.E.2d 795, 799-800 (S.C. Ct. App. 2005) (South Carolina law requires plaintiff to produce expert testimony on standard of care and the defendant's failure to conform to the required standard, unless the subject matter is of common knowledge or experience so that no special learning is needed to evaluate the defendant's conduct); *Gindraw v. Dendler*, 967 F. Supp. 833, 837 (E.D. Pa. 1997) (Pennsylvania law requires plaintiff to produce expert testimony showing physician's conduct varied from accepted medical practice except where the matter and investigation is so simple and the lack of skill or want of care is so obvious as to be within the range of ordinary experience or comprehension of even non-professional persons).

The United States submitted the affidavit of Dr. Stallings, the surgeon who performed the hernia operation, who testified that in his best professional judgment "there was no medical complication caused by the passage of time between the discovery of the hernia and the date of the surgical correction." He further stated that "[h]aving surgical correction of a reducible hernia one year from the date of diagnosis, especially when the hernia has not become strangulated or incarcerated, is very good medical care." He opined that there was no violation of any medical or surgical duty of care in the treatment the plaintiff received for his hernia (Stallings aff. ¶¶ 27-28).

The plaintiff has failed to establish, and the record does not reflect, that the subject matter is of such common knowledge or experience so that no special learning is

needed to evaluate the defendant's conduct. Accordingly, he is not relieved of the requirement to provide expert testimony in support of his claim. In his complaint, the plaintiff identifies himself and Dr. Stallings as medical experts. As set forth above, Dr. Stallings' affidavit supports the defendant's position. Further, the plaintiff's prior experience as an Emergency Medical Technician does not qualify him as an expert (compl., p. 6). *See Jones v. Wike*, 654 F.2d 1129, 1130 (5th Cir. 1981) (registered nurse not appropriate as expert in proper medical care for hernias).

The plaintiff also alleges in his complaint that certain entries in the medical record dated December 13, 2001; November 6, 2002; and November 25, 2002 were falsified (compl., p. 3-4). The plaintiff has offered no evidence in support of his claims.

The plaintiff has failed to show, under Pennsylvania or South Carolina law, that the medical staff at either FCI Allenwood or FCI Edgefield were negligent and that such negligence was the proximate cause of his injuries. Accordingly, his medical malpractice claims fail.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment be granted. All pending nondispositive motions are held in abeyance pending the district judge's disposition of the motion for summary judgment. Should the district judge adopt this court's recommendation, these motions will be rendered moot.

s/William M. Catoe
United States Magistrate Judge

November 8, 2005

Greenville, South Carolina